**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| GREAT AMERICAN ALLIANCE INSURANCE COMPANY,<br><br>        Plaintiff,<br><br>vs.<br><br>GLOBAL MANAGEMENT & INVESTMENT CORPORATION, and SHIV GLOBAL HOTEL, LLC,<br><br>        Defendants. | CIVIL ACTION FILE NO. 1:25-CV-00375-SEG |

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION
TO DISMISS AMENDED COMPLAINT**

COMES NOW Plaintiff Great American Alliance Insurance Company ("Great American"), through undersigned counsel, and for its Response in Opposition to Defendants Global Management & Investment Corporation ("GMIC") and Shiv Global Hotel, LLC's ("Shiv Global" and collectively with GMIC, "Defendants") Motion to Dismiss Great American's Amended Complaint (Doc. 35), states as follows:

## I.   INTRODUCTION

This case is about whether an insurance policy procured through material misrepresentation is ripe for rescission as permitted under Georgia law. Defendants' argument that a bona fide claim for rescission of an umbrella policy under Georgia

law is not ripe for rescission in federal court because the underlying policy has not been exhausted reflects a fundamental misconception of the undeniable distinction between voiding a policy *ab initio* (as if it never existed) and a declaration of no coverage based upon a policy term, exclusion, or condition.

Great American filed the original Complaint seeking rescission of the umbrella policy after discovering that Defendants falsely represented on their application that no incidents of death or violent acts had occurred at 2859 Panola Road, Lithonia, Georgia (the "Knights Inn Location"), when in fact a double murder had occurred there fourteen months before the application was submitted, and Defendants unequivocally knew it. The Court dismissed the original Complaint without prejudice for lack of a sufficiently immediate controversy and granted leave to amend. Great American filed its Amended Complaint and Defendants now move to dismiss again on the purported basis that the Court continues to lack subject matter jurisdiction. For the reasons below, the Motion to Dismiss lacks merit.

In its March 30, 2026 Order, the Court applied the Article III standard by asking whether the facts alleged show a "substantial likelihood" of future injury and a substantial controversy of "sufficient immediacy and reality" to warrant adjudication. (Doc. 30 at 16-17). The Court granted leave to amend, recognizing that the facts had "evolved significantly" and that intervening developments could permit an amended complaint to plead the concrete controversy the Court's analysis

required. (Doc. 30 at 25-26).

Great American's Amended Complaint does exactly that. The lawsuit *K.S. v. Hare Krishna Decatur Hotel, LLC d/b/a Motel 6, et al.*, Case No. 1:26-cv-01375-TRJ (N.D. Ga.) (the "K.S. Lawsuit"), filed since the original Complaint, alleges that K.S. was trafficked at the Knights Inn location from May 2015 through September 2017, a period that includes conduct within the applicable policy period. (Doc. 31, ¶47). That lawsuit is proceeding on the merits: Shiv Global has answered and is defending the claims related to the Knights Inn Location; and no motion to dismiss has been filed as to Defendants' alleged liability at the Knights Inn Location. The Western World Insurance Company primary policy's (the "Western World Primary Policy") $2,000,000 designated-location aggregate limit for the Knights Inn Location has been eroded to approximately $719,500, which is a fraction of even the lowest TVPRA recovery against a hotel defendant in this District. (Doc. 31, ¶¶ 43-45, 48). Further, *I.D. v. Hare Krishna Decatur Hotel, LLC d/b/a Motel 6 et al.*, Case No. 1:25-cv-06790-AT (N.D. Ga.) (the "I.D. Lawsuit"), also filed since the original Complaint, confirms that new TVPRA claims continue to be asserted against the Knights Inn location based on historical trafficking allegations. (Doc. 31, ¶ 46).

Lastly, Defendants' own actions in this litigation confirm the adversity the Court requires. Recognizing their need to preserve the umbrella policy for high-exposure TVPRA claims, Defendants refused to consider a policy buyback as part

of a global settlement for another trafficking claim at the Knights Inn Location (Doc. 31, ¶ 51), which ultimately resolved for $1,000,000 of the Western World limits further eroding the designated-location aggregate limit. Defendants have now filed two successive motions opposing rescission of a policy procured through material misrepresentations.

These facts establish the "substantial likelihood" of future injury and the "practical interest" in rescission that the Court's Order required. (Doc. 30 at 17, 20). Defendants' argument that no duties under the policy have arisen and that the primary limits have not been exhausted (Doc. 35-1 at 6-13) does not answer the question presented. The Amended Complaint does not ask whether Great American must defend or indemnify. It asks whether the umbrella policy, procured through misrepresentations, should be voided. The Amended Complaint alleges concrete facts showing why that question has practical consequences for both parties that warrant adjudication now. The Motion to Dismiss should be denied.

## II.   **FACTS AND PROCEDURAL BACKGROUND**

The facts underlying Great American's rescission claim are set forth in detail in the Amended Complaint and are familiar to the Court. In brief, Defendants represented in a November 6, 2015 application (the "Application") that there were no incidents of "death" and no "violent acts of any kind" at the Knights Inn Location. (Doc. 31, ¶¶ 25-28). Those representations were patently false: a double murder

occurred at the Knights Inn Location on September 15, 2014, and Defendants' employees, including the general manager, had contemporaneous knowledge of it before the Application was submitted. (Doc. 31, ¶¶ 35-39, 41). In reliance on the representations in the Application, Great American issued commercial umbrella and excess liability coverage to GMIC and Shiv Global for the Knights Inn Location through Certificate No. 2732 and Great American's Master Policy No. UM 3718488 (collectively, the "Umbrella Policy"). (Doc. 31, ¶31). Great American would not have issued the Umbrella Policy had the truth been known. (Doc. 31, ¶¶ 40, 42).

Great American filed the original Complaint on January 28, 2025. (Doc. 1). Defendants moved to dismiss (Doc. 14), and after full briefing (Docs. 20, 23, 24), the Court granted the motion without prejudice on March 30, 2026, concluding that the original Complaint did not present a sufficiently immediate and concrete controversy. (Doc. 30). The Court granted leave to amend within fourteen days. (Doc. 30 at 25-26).

While the original motion to dismiss was pending, two additional civil actions were filed in this District against Defendants alleging sex trafficking at the Knights Inn Location. On November 25, 2025, the I.D. Lawsuit was filed alleging trafficking at the Knights Inn Location from October 2017 through February 2021. (Doc. 31, ¶ 46). On March 12, 2026, the K.S. Lawsuit was filed alleging trafficking at the Knights Inn Location from May 2015 through September 2017, overlapping the

Umbrella Policy period. (Doc. 31, ¶ 47).

On April 13, 2026, Great American filed the Amended Complaint, which asserts Count I for equitable rescission under O.C.G.A. § 33-24-7 and, in the alternative, Count II for a prospective declaration of the right to rescind. (Doc. 31). To establish justiciability of Great American's rescission claim pursuant to the criteria set forth in the March 30, 2026 Order, the Amended Complaint further alleges that the K.S. Lawsuit asserts claims against Defendants for trafficking at the Knights Inn Location during the relevant policy period; that the Western World Primary Policy's designated-location aggregate for the Knights Inn Location has been eroded to approximately $719,500 remaining in policy limits; and that recent TVPRA outcomes against hotel defendants in this District have ranged from $5,000,000 to $40,000,000 per plaintiff. (Doc. 31, ¶¶ 43-45, 47-48). Great American also alleges that it presented a policy buyback offer to Defendants, which Defendants did not accept or respond to (Doc. 31, ¶ 51), and contemporaneously filed a Motion for Leave to Deposit Premiums into the Court's Registry under Fed. R. Civ. P. 67, conditioned on a final rescission judgment (Doc. 32).

On April 27, 2026, Defendants filed the instant Motion to Dismiss pursuant to Rules 12(b)(1) and 12(b)(6). (Doc. 35). Defendants argue that: (1) Count II is not ripe because the primary limits have not been exhausted and Great American's duties to defend and indemnify have not been triggered (Doc. 35-1 at 6-11); (2) Count I

does not create a case or controversy because "federal jurisdiction cannot be expanded by state statute" (Doc. 35-1 at 11-13); and (3) Count I fails as a matter of law because the Umbrella Policy's Condition U contractually bars rescission absent intentional nondisclosure subject to Rule 9(b) (Doc. 35-1 at 13-15). Each argument lacks merit for the reasons discussed below.

### III.   LEGAL STANDARD

A motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1) may be facial or factual. *Carmichael v. Kellogg, Brown & Root Servs., Inc.*, 572 F.3d 1271, 1279 (11th Cir. 2009). In a facial challenge, a court determines whether the plaintiff has sufficiently alleged a basis for subject matter jurisdiction, taking the complaint's allegations as true. *Id.* "When defending against a facial attack, the plaintiff has 'safeguards similar to those retained when a Rule 12(b)(6) motion to dismiss for failure to state a claim is raised.'" *Stalley v. Orlando Reg'l Healthcare Sys., Inc.*, 524 F.3d 1229, 1233 (11th Cir. 2008) (internal citation omitted).

To survive a motion to dismiss brought pursuant to Fed. R. Civ. P. 12(b)(6), a claim "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face,'" meaning that it must contain "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556, 570 (2007)). "A claim has facial plausibility

when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. (quoting *Twombly,* 550 U.S. at 556). "[T]he pleadings are construed broadly," *Levine v. World Fin. Network Nat'l Bank*, 437 F.3d 1118, 1120 (11th Cir. 2006), and the allegations in the complaint are viewed "in the light most favorable to the plaintiff." *Bishop v. Ross Earle & Bonan, P.A.*, 817 F.3d 1268, 1270 (11th Cir. 2016).

## IV.    ARGUMENT AND CITATION OF AUTHORITY

### A. The Amended Complaint Establishes a Justiciable Controversy

#### 1.  The Article III Standard

Federal judicial power under Article III, Section 2 of the United States Constitution extends only to concrete "cases or controversies." *Atlanta Gas Light Co. v. Aetna Cas. & Sur. Co.*, 68 F.3d 409, 414 (11th Cir. 1995). "Whether such a controversy exists is determined on a case-by-case basis" and by the totality of the circumstances. *Id.* (quoting *United States Fire Ins. Co. v. Caulkins Indiantown Citrus*, 931 F.2d 744, 747 (11th Cir. 1991)). "The controversy must be more than conjectural; the case must 'touch the legal relations of parties having adverse legal interests.'" *Id.* An actual controversy exists where "there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant" adjudication. *GTE Directories Pub. Corp. v. Trimen Am., Inc.*, 67 F.3d 1563, 1567 (11th Cir. 1995) (quoting *Md. Cas. Co. v. Pacific Coal & Oil Co.*, 312

U.S. 270, 273 (1941)). "[T]he practical likelihood that the contingencies will occur and that the controversy is a real one should be decisive in determining whether an actual controversy exists." *Id.* at 1569.

### 2. The Amended Complaint Addresses Each Aspect of the Court's Prior Justiciability Analysis

This Court applied the Article III principles discussed above in its March 30, 2026 Order. The Court noted a plaintiff, like Great American, "must allege facts from which it appears that there is a substantial likelihood that [it] will suffer injury in the future" to establish a justiciable controversy. (Doc. 30 at 17). In the rescission context, the Court looked for an "immediate threat of future injury" and a "practical interest" in the requested relief. (Doc. 30 at 19-20). The Court found those elements not adequately alleged in the original Complaint and granted leave to amend, recognizing that the facts had "evolved significantly" since the original filing. (Doc. 30 at 17-26). Defendants contend that "nothing changed over the two weeks between the dismissal and the filing of the Amended Complaint." (Doc. 35-1 at 13). But the relevant temporal comparison is not between the Order and the Amended Complaint; it is between the original Complaint and the Amended Complaint. The Amended Complaint alleges exactly the kind of concrete facts the Court's analysis contemplated (facts that were not alleged in the original Complaint but that show a future injury is likely to occur) to satisfy Article III's "controversy" requirement.

The Court observed that the original Complaint did "not identify any claim or

potential claim or liability that has arisen or may arise in the absence of a declaration of rescission." (Doc. 30 at 17-18).[1] The Amended Complaint identifies two specific, pending TVPRA lawsuits filed in this District against Defendants that allege trafficking at the Knights Inn Location: the K.S. Lawsuit, which alleges trafficking during the Umbrella Policy period[2]; and the I.D. Lawsuit, which alleges trafficking at the same location from October 2017 through February 2021. (Doc. 31, ¶¶ 46-47). The K.S. Lawsuit is not a speculative or hypothetical claim. It is a filed, served, and actively defended lawsuit. Shiv Global has answered the First Amended Complaint (K.S. Lawsuit, Doc. 25) and is defending the claims related to the Knights Inn Location on the merits. No motion to dismiss has been filed as to Shiv Global and the claims related to the Knights Inn Location.[3] Further, while the I.D. Lawsuit's

---

[1] While Great American maintains that a standalone rescission claim based upon a misrepresentation in an application constitutes a justiciable controversy in and of itself, nonetheless, the Amended Complaint identifies new facts, including additional trafficking claims, that solidify the existence of a concrete controversy.

[2] Subsequent to Great American's filing of its Amended Complaint, a First Amended Complaint was filed in the K.S. Lawsuit on April 23, 2026. (K.S. Lawsuit, Doc. 23). The allegations related to the Knights Inn Location are substantively unchanged from the original K.S. Complaint and continue to allege trafficking at the Knights Inn Location from approximately May 1, 2015, through September 30, 2017, which overlaps the Umbrella Policy period.

[3] Defendants suggest GMIC's partial motion to dismiss in the K.S. Lawsuit could reduce the likelihood the Umbrella Policy is implicated. (Doc. 35-1 at 10 n.2). That is inaccurate. The motion Defendants cite (K.S. Lawsuit, Doc. 13-1) targeted only Motel 6 claims and is now moot. (*See* K.S. Lawsuit, Text Order dated Apr. 23, 2026). The current motion to dismiss (K.S. Lawsuit, Doc. 26) likewise addresses only Motel

currently alleged trafficking period falls outside the Umbrella Policy period, the I.D. Lawsuit remains relevant because, like the K.S. Lawsuit, it demonstrates that TVPRA claims against the Knights Inn Location continue to be filed by new claimants alleging historical trafficking at that property. The I.D. Lawsuit therefore reinforces the reality that delayed TVPRA claims at the Knights Inn Location are not hypothetical, but are in fact likely, if not inevitable, to occur against Defendants for this location. The K.S. Lawsuit not only reiterated this assertion but also supplies the direct policy-period allegations of trafficking at the Knights Inn Location.

The Court observed that the Umbrella Policy "covers a period that ended nearly a decade ago." (Doc. 30 at 18). The K.S. Lawsuit alleges conduct that falls squarely within that period, from May 2015 through September 2017, overlapping with the November 26, 2015 through November 26, 2016 policy period. (Doc. 31, ¶ 47). Further, the ongoing filing of new TVPRA claims against Defendants related to the Knights Inn Location by the Stoddard Firm, the same plaintiffs' counsel that filed the now settled M.P. Lawsuit and the pending I.D. Lawsuit and K.S. Lawsuit, underscores the persistent nature of TVPRA exposure at this particular property. Trafficking survivors frequently do not come forward until years after their exploitation, and counsel experienced in this litigation are positioned to continue

---

6. Neither motion addresses K.S.'s claims against Defendants related to the Knights Inn Location.

identifying and representing additional claimants, including those allegedly trafficked at the Knight Inn Location. The pattern of claims here (i.e., new plaintiffs coming forward nearly a decade after the fact alleging trafficking at the Knights Inn Location, including trafficking that occurred during the Umbrella Policy period) confirms both the nature of TVPRA claims and the substantial ongoing risk that additional claims against Defendants related to the Knight Inn Location will be filed. In short, the Knights Inn Location has become a focal point for TVPRA litigation in this District, and the totality of these circumstances (documented trafficking history, substantially eroded primary limits, multiple pending lawsuits by experienced plaintiffs' counsel, and the well-established pattern of delayed disclosure by trafficking survivors) establishes that the controversy is real and immediate.

The Court also observed that there was no "practical interest" demonstrated and no "articulable harm on the horizon" related to the rescission sought in the original Complaint. (Doc. 30 at 20-21). The Amended Complaint now alleges that the Western World Primary Policy's designated-location general aggregate limit for the Knights Inn Location has been eroded by approximately $1,280,500, leaving approximately $719,500 remaining in primary limits. (Doc. 31, ¶¶ 43-45). As alleged in the Amended Complaint, that remaining amount must be measured against the TVPRA damages landscape in this District, where recent outcomes against hotel defendants have ranged from approximately $5,000,000 to $40,000,000 per plaintiff,

including punitive damages and attorneys' fees. (Doc. 31, ¶ 48). The remaining Western World primary limits are a fraction of even the lowest of these outcomes. This is arithmetic, not speculation. Because the value of trafficking cases involving minors has yielded seven figure outcomes, the exhaustion of Western World's remaining $719,500 in limits is all but certain.

Lastly, the Court observed that the original Complaint did not allege "any concrete way in which [Great American] would stand to benefit from rescission, in the absence of a pending or threatened claim." (Doc. 30 at 18). The facts now alleged in the Amended Complaint make that benefit concrete. Absent rescission, the pleaded facts make evident a practical likelihood that the Umbrella Policy will be triggered because of the pending TVPRA litigation that alleges trafficking conduct at the insured location within the policy period and the substantially eroded primary limits. (Doc. 31, ¶¶ 43-48). Defendants' refusal to agree to rescission further confirms that adversity, showing their present interest in preserving the Umbrella Policy for these high-exposure claims. (Doc. 31, ¶ 51).

In short, the Amended Complaint identifies concrete, pending claims; demonstrates a practical interest through substantial primary-limit erosion and documented TVPRA outcomes in this District; specifies the K.S. Lawsuit as alleging trafficking conduct falling squarely within the policy period; and shows that rescission would relieve Great American of a substantial threat of coverage

obligations under a policy procured through material misrepresentations. These allegations present a substantial controversy sufficient to satisfy Article III.

### 3. Defendants' Cited Cases Are Not Binding and Are Factually Distinguishable

Defendants rely principally on *Ironshore Indem., Inc. v. Banyon 1030-32, LLC*, No. 0:10-cv-60285-UU, 2010 U.S. Dist. LEXIS 153457 (S.D. Fla. May 28, 2010), *Wilshire Ins. Co. v. Crestview Towers Condo. Ass'n, Inc.*, No. 1:21-cv-23214-EGT, 2023 U.S. Dist. LEXIS 111622 (S.D. Fla. June 27, 2023), *report and recommendation adopted*, No. 1:21-cv-23214-DPG, 2023 U.S. Dist. LEXIS 145510 (S.D. Fla. Aug. 18, 2023), and *Axis Surplus Ins. Co. v. Contravest Construction Co.*, 921 F. Supp. 2d 1338 (M.D. Fla. 2012). (Doc. 35-1 at 7-12). As a threshold matter, these are all decisions from the Southern and Middle Districts of Florida and are not binding on this Court. Each is also factually distinguishable.

In *Ironshore*, the excess insurer sought a declaration that its excess policy was void *ab initio* because of alleged application misrepresentations and, in the alternative, that Ponzi-scheme indemnity claims were excluded from coverage. 2010 U.S. Dist. LEXIS 153457, at *2-3. The court dismissed the action because the excess insurer alleged no exhaustion of the $30 million underlying coverage, no facts showing that claims were likely to exhaust that underlying coverage, and only vague "separate claims" and claims the insureds "have made and/or will make." *Id.* at *3-6. In contrast, Great American's Amended Complaint identifies two specific, filed

federal TVPRA lawsuits at the relevant insured location, one alleging conduct within the applicable policy period; alleges $1,280,500 in primary aggregate erosion leaving only $719,500 remaining in primary limits; and pleads TVPRA damages benchmarks demonstrating that the remaining primary limit is a fraction of expected exposure for a single trafficking case that involves a minor. (Doc. 31, ¶¶45-48). These are the concrete facts that were absent in *Ironshore* and ultimately fatal to Ironshore's request to void its policy.

In *Crestview*, the court treated the excess insurer's rescission claim as derivative of its failed duty-to-defend and duty-to-indemnify claims, holding that the "lack of an actual case or controversy is fatal both to the claim for declaration of rescission and the claim for declaration of no coverage under the exclusions." 2023 U.S. Dist. LEXIS 111622, at *24-25 (quoting *Ironshore*). But *Crestview* is distinguishable on narrower grounds. Although the underlying lawsuits had been tendered to the umbrella insurer, the complaint did not allege facts showing that those claims were likely to reach the umbrella layer, and the court declined to consider practical-likelihood allegations raised only in opposition briefing. *Id* at 24. Unlike *Crestview*, as explained above the Amended Complaint itself alleges facts supporting a practical likelihood of excess exposure triggering the Umbrella Policy.

In *Axis Surplus*, the court addressed whether an excess insurer's duties to defend and indemnify were ripe for declaratory adjudication where the underlying

primary limits had not been exhausted. 921 F. Supp. 2d at 1344-45. However, in *Axis Surplus*, the excess insurer was not seeking to rescind its policy. That is a different posture from this case. Great American is not asking this Court to determine whether it must defend or indemnify anyone. It is asking whether the Umbrella Policy, procured through misrepresentations, was validly formed. While exhaustion may be relevant to when an excess insurer's coverage obligations ripen, it does not control whether an insurer with a concrete stake in a policy's validity may seek to void a policy obtained through false statements on an application. Great American has alleged such a stake in its Amended Complaint.

Beyond being factually distinguishable, Defendants' cited cases do not compel the result Defendants seek. Defendants appear to argue that the exhaustion of primary limits and the triggering of the duties to defend and indemnify are prerequisites for a justiciable controversy involving an excess insurer. (Doc. 35-1 at 6-9). But this Court's Order did not establish exhaustion as the exclusive pathway to justiciability. Rather, as discussed above, the Court asked whether the plaintiff alleged "facts from which it appears that there is a substantial likelihood that [it] will suffer injury in the future." (Doc. 30 at 17). The Court also looked to whether the insurer had a "practical interest" in rescission. (Doc. 30 at 20). The Court did not find that the original Complaint lacked justiciability simply because the primary limits had not been exhausted, but rather because the original Complaint failed to

allege concrete factual predicates that would demonstrate a "practical likelihood of a future claim, or some other articulable harm on the horizon." (Doc. 30 at 21). The Amended Complaint now supplies those missing elements.[4] As discussed above, the Amended Complaint alleges pending litigation with trafficking conduct within the policy period, substantial erosion of primary limits, a refused buyback offer, and TVPRA damages benchmarks that establish a practical likelihood that the Umbrella Policy will be implicated. These are precisely the kinds of "practical interests" the Court found absent from the original Complaint. The question, then, is not whether the Umbrella Policy has been triggered in the conventional coverage sense, but whether the Amended Complaint's factual allegations demonstrate the substantial likelihood of future injury and practical interest in rescission that the Court's Order required. For the reasons set forth above, they do.

### B. Count I States a Plausible Claim for Equitable Rescission; Condition U Does Not Bar the Claim; and Rule 9(b) Does Not Apply

#### 1. Defendants Mischaracterize the Role of State Law and Misapply Article III

With respect to the Amended Complaint's Count I for statutory rescission

---

[4] Courts addressing excess-insurer declaratory claims have recognized that such claims may be ripe before actual exhaustion where the record shows a substantial or practical likelihood that the excess layer will be reached. *See, e.g.*, *E.R. Squibb & Sons, Inc. v. Lloyd's & Cos.*, 241 F.3d 154, 177-78 (2d Cir. 2001); *Century Indem. Co. v. Marine Group, LLC*, 848 F. Supp. 2d 1229, 1235-37 (D. Or. 2012); *Seattle Times Co. v. Nat'l Sur. Corp.*, 2016 U.S. Dist. LEXIS 69981, at *8-12 (W.D. Wash. May 27, 2016).

under O.C.G.A. § 33-24-7, Defendants argue that "federal jurisdiction cannot be expanded by state statute" and that adding a state-law rescission count "cannot sidestep the jurisdictional case law[.]" (Doc. 35-1 at 11). Great American agrees that Article III sets the outer boundary of federal jurisdiction. But Great American is not arguing that O.C.G.A. § 33-24-7 creates federal jurisdiction. Diversity jurisdiction under 28 U.S.C. § 1332 provides the jurisdictional basis. The state statute provides the substantive cause of action. And the Amended Complaint's factual allegations (discussed in detail above) supply the Article III controversy, not the state statute.

Defendants further argue that O.C.G.A § 33-24-7 "specifically discusses whether incorrect statements in applications prevent recovery under a policy or contract" and that because "there is no claim against the policy for coverage," the statute has no work to do. (Doc. 35-1 at 12-13.). This misreads the statute. O.C.G.A § 33-24-7(b) does not make a pending coverage claim an element of rescission. Rather, it identifies specific circumstances under which application misrepresentations render a policy voidable and when misrepresentations in an application "shall not prevent a recovery under the policy." O.C.G.A. § 33-24-7(b). Read in context, the statute establishes the specific elements required to show when a policy is voidable due to misrepresentation; whereas the Article III question is whether the Amended Complaint alleges a concrete controversy, which it does for the reasons set forth above.

### 2.  Condition U Does Not Apply to the Misrepresentations at Issue

Perhaps recognizing their procedural arguments to challenge the Amended Complaint will likely fail, Defendants now argue that the Umbrella Policy's Condition U contractually bars rescission absent a showing of intentional nondisclosure. (Doc. 35-1 at 13-15). The argument fails because Condition U, by its plain terms, does not apply to the misrepresentations at issue in this case. Condition U provides that an insured's "failure to disclose all hazards existing as of the inception date of this Policy will not prejudice that 'Insured's' insurance," provided the failure was "not intentional" and was "reported to us as soon as practicable after its discovery." (Doc. 31-2 at 39-40).

By its plain terms, Condition U addresses an insured's failure to disclose "hazards existing as of the inception date." In standard insurance usage, a "hazard" is a forward-looking condition that increases the probability or severity of loss, such as inadequate security measures or ongoing construction activity. *See, e.g.*, O.C.G.A. § 33-24-7(b)(3) (using the term "hazard" to explain how certain conditions increasing the likelihood of loss can affect an insurer's policy issuance decision); O.C.G.A. § 33-24-46(c)(2)(C)(using the term "hazard" to explain that cancellation of a policy is acceptable by an insurer when the risk insured against increases). The 2014 double homicide at the Knights Inn Location is not a "hazard existing as of the inception date" as Condition U requires. Rather, the double homicide was a discrete,

completed prior incident of "Death" and "violent acts of any kind" that the Application expressly asked about in Section I, Subsections 6.D.i. and 6.D.vi., which Defendants knowingly failed to disclose (Doc. 31, ¶¶ 27-28, 37-42).

To further support this point, the Application and Umbrella Policy distinguish between these concepts. Section I.6.D asks about prior "incidents," that is, loss history. (Doc. 31-1 at 22). These are discrete events that have already occurred when the Application is completed. Conversely, Condition U addresses "hazards existing as of the inception date," that is, forward-looking operational risk conditions. Great American's rescission claim is based on false answers to specific application questions about prior incidents of death and violent acts, not on a failure to disclose an operational hazard. Condition U has no application to these facts.

### 3. Even If Condition U Applied, It Did Not Waive the Statutory Rescission Right

Even if Condition U could be read to encompass the 2014 double homicide, which it cannot, it would not operate to waive Great American's statutory right to rescind under O.C.G.A. § 33-24-7. The Eleventh Circuit has held that "subsection 33-24-7(b)(2) establishes an independent basis for rescission that is not limited by the language of the policy." *Am. Gen. Life Ins. Co. v. Schoenthal Family, LLC*, 555 F.3d 1331, 1340 (11th Cir. 2009). The court further noted that "[e]xpress waivers by insurers, not permissive statements by an insured, have been found to limit the right of an insurer to seek rescission." *Id.* at 1341. Condition U is not an express waiver

by Great American of its rescission rights. Instead, it is a non-prejudice clause benefiting the insured. Moreover, Condition U does not limit or waive Great American's independent statutory right to rescind for material misrepresentation under O.C.G.A § 33-24-7(b)(2) or (b)(3).[5]

Defendants cite *Modern Carpet Indus., Inc. v. Factory Ins. Ass'n*, 125 Ga. App. 150, 151, 186 S.E.2d 586 (1971), for the proposition that "the limitations contained in [a written insurance contract] supersede any other general statutory limitations." (Doc. 35-1 at 14). *Modern Carpet* is inapposite to the issues here. Indeed, *Modern Carpet* addressed whether a contractual suit-limitation clause could supersede a longer general statute of limitations, a procedural limitation on when to sue, not a substantive waiver of the insurer's statutory right to rescind for material application misrepresentation. 125 Ga. App. at 150-52. O.C.G.A. § 33-24-7 is not a "general statutory limitation." It is a specific statutory framework governing the effect of misrepresentations on insurance contracts, which the Eleventh Circuit has

---

[5] Courts have held that clauses excusing unintentional errors or omissions do not waive the insurer's right to rescind for material application misrepresentations. *See, e.g.*, *Atmel Corp. v. St. Paul Fire & Marine*, 426 F. Supp. 2d 1039, 1048-50 (N.D. Cal. 2005) (holding that "[a]n insurer's statement that a party's rights will not be affected due to unintentional errors or omissions is *not* tantamount to the insurer's waiver of its statutory right to material information in the application process") (emphasis in original); *AMI Stamping, LLC v. ACE Am. Ins. Co.*, 709 F. App'x 354, 362 (6th Cir. 2017) (holding that policy language permitting rescission for intentional misrepresentation did not waive insurer's common law right to rescind for unintentional misrepresentation).

recognized "establishes an independent basis for rescission that is not limited by the language of the policy." *Schoenthal*, 555 F.3d at 1340.

### 4. Condition U's Predicates Are Affirmative Defenses Not Resolvable at Rule 12

Even assuming Condition U applied and could somehow limit the statutory right to rescission (neither of which is correct), its predicates, that the failure to disclose was "not intentional" and was "reported to [Great American] as soon as practicable," are fact-intensive inquiries that cannot be resolved against Great American on a Rule 12 motion. These are affirmative, fact-intensive issues that Defendants bear the burden to prove. "'[P]laintiffs [are] not required to negate an affirmative defense in [their] complaint.'" *LaGrasta v. First Union Sec., Inc.*, 358 F.3d 840, 845 (11th Cir. 2004) (quoting *Tregenza v. Great Am. Commc'ns Co.*, 12 F.3d 717, 718 (7th Cir. 1993)).

Defendants' argument that "Plaintiff could never satisfy the intentionality requirement of Condition U because the insurance agreement was signed not by the Defendant itself but by its broker" (Doc. 35-1 at 15) underscores the point. Whether the non-disclosure was "intentional," and whose knowledge is imputed to whom, are quintessential fact questions inappropriate for Rule 12 resolution. Condition U therefore provides no basis for dismissal, particularly at the pleading stage.

### 5. Even If Rule 9(b) Applied, the Amended Complaint Satisfies It

Even if this Court were to conclude that Condition U applies and that its

intentionality requirement somehow triggers Rule 9(b)'s heightened pleading standard (something Great American does not concede), the Amended Complaint satisfies that standard. Rule 9(b) requires that a complaint "state with particularity the circumstances constituting fraud or mistake." To satisfy that standard, a complaint must plead "such matters as the time, place and contents of false representations, as well as the identity of the person making the misrepresentation and what was obtained or given up thereby." *WESI, LLC v. Compass Envtl., Inc.*, 509 F. Supp. 2d 1353, 1358 (N.D. Ga. 2007) (quoting *Parnes v. Gateway 2000, Inc.*, 122 F.3d 539, 549-50 (8th Cir. 1997)). Significantly, Rule 9(b) "must not abrogate the concept of notice pleading" and must be read in conjunction with Rule 8. *Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194, 1202 (11th Cir. 2001) (quoting *Durham v. Bus. Mgmt. Assocs.*, 847 F.2d 1505, 1511 (11th Cir. 1988)).

The Amended Complaint identifies the specific false statements (the "Death" and "violent acts of any kind" questions marked "No"), the application section (Section I.6.D of the Application), the signatory and date (Melissa Sheker on behalf of IOA signed on November 6, 2015), the underlying facts demonstrating falsity (the September 15, 2014 double homicide and the contemporaneous knowledge of Defendants' employees, including General Manager Ghadawala), and the materiality basis (Great American would not have issued the policy had the truth been known). (Doc. 31, ¶¶ 27-28, 30, 37-42). This exceeds what Rule 8 requires and

satisfies any heightened standard. *See General Star Indem. Co. v. Triumph Hous. Mgmt., LLC*, 2018 U.S. Dist. LEXIS 232823, at \*10 (N.D. Ga. Nov. 9, 2018) (finding rescission complaint satisfied Rule 9(b) where it identified the false statements and the identity of the agent who made them).[6]

### C. Count II: Prospective Declaration of the Right to Rescind

Count II is pleaded in the alternative to Count I and seeks a prospective declaration that Great American has the right to rescind the Umbrella Policy as applied to the Knights Inn Location. (Doc. 31, ¶¶ 59-63). For the reasons set forth in Section IV.A above, Defendants' ripeness challenge to Count II fails. Rule 8(d)(2) permits Great American to plead Count II in the alternative at the pleadings stage.

## V.   LEAVE TO AMEND

In the event the Court identifies any aspect of the Amended Complaint that warrants further development, Great American respectfully requests leave to further amend under Rule 15(a)(2). "The court should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). A court should deny leave only where "there has been undue delay, bad faith, dilatory motive, or repeated failure to cure deficiencies

---

[6] The foregoing Rule 9(b) analysis is provided only in the alternative. Count I seeks rescission under O.C.G.A. § 33-24-7(b)(2) and (b)(3), neither of which requires fraudulent intent. The statutory test is objective materiality or good-faith issuance, not fraud. *Schoenthal*, 555 F.3d at 1340; *Ga. Cas. & Sur. Co. v. Valley Wood, Inc.*, 336 Ga. App. 795, 797-98, 783 S.E.2d 441 (2016). Because Count I does not allege fraud or mistake, Rule 9(b) does not apply by its terms. Fed. R. Civ. P. 9(b).

by amendments previously allowed," "where allowing amendment would cause undue prejudice to the opposing party," or "where amendment would be futile." *Corsello v. Lincare, Inc.*, 428 F.3d 1008, 1014 (11th Cir. 2005). None of those circumstances are present here. This is Great American's first amended complaint, consistent with the Court's directive in its March 30, 2026 Order. (Doc. 30 at 23-26).

## VI.  CONCLUSION

For the foregoing reasons, Great American respectfully requests that this Court deny Defendants' Motion to Dismiss in its entirety. In the alternative, if the Court identifies any aspect of the Amended Complaint that warrants further development, Great American requests leave to further amend.

Submitted this 25th day of May, 2026.

**WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER, LLP**

3348 Peachtree Rd. NE
Suite 1400
Atlanta, GA 30326
Telephone: (470) 419-6650
Facsimile:  (470) 419-6651
kyle.barrett@wilsonelser.com
mark.vespole@wilsonelser.com

*/s/ Kyle P. Barrett*
Kyle P. Barrett
Georgia Bar No. 874795
Mark Vespole (admitted *pro hac vice*)
*Counsel for Plaintiff*

## <u>CERTIFICATE OF COMPLIANCE PURSUANT TO L.R. 7.1(D)</u>

Pursuant to L.R. 7.1(D), I certify that I prepared this document utilizing Size

14 Times New Roman font as required by L.R. 5.1(B).

Dated: May 25, 2026

<u>*/s/ Kyle P. Barrett*</u>
Kyle P. Barrett
Georgia Bar No. 874795
*Counsel for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that I have this date filed the within and foregoing **PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AMENDED COMPLAINT** using the Clerk's CM/ECF electronic filing system**,** which will generate an electronic notice to all counsel of record.

Dated: May 25, 2026

/s/ Kyle P. Barrett
Kyle P. Barrett
Georgia Bar No. 874795
*Counsel for Plaintiff*